# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

In the Matter of the Search of:  )
*(Briefly describe the property to be searched or identify the person by name and address)*  )

Apple Inc., an electronic communications service and/or remote computing service headquartered at One Apple Park Way, Cupertino, California, host of iCloud Account alainrivas78@gmail.com (the Target Account).)  )

Case No. **'25 MJ5270**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is hereby incorporated by reference.

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 952, 960, 963 | Importation of federally controlled substances and conspiracy to commit the same. |

The application is based on these facts:

See attached Affidavit of Kevin Day, Special Agent, HSI, which is hereby incorporated by reference.

☒ Continued on the attached sheet.

☐ An Order of Nondisclosure is requested under 18 U.S.C. § 2705(b), the basis of which is set forth on the attached sheet.

_____
*Kevin Day*
*Applicant's signature*

_____
Kevin Day, Special Agent, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date: <u>September 25, 2025</u>

_____
*Michelle M. Pettit*
*Judge's Signature*

City and State: <u>San Diego, California</u>

<u>Honorable Michelle M. Pettit, U.S. Magistrate Judge</u>
*Printed name and title*

**ATTACHMENT A**
PROPERTY TO BE SEARCHED

This warrant applies to information associated with the below iCloud account:

- iCloud Account: alainrivas78@gmail.com;

that is stored at the premises owned, maintained, controlled, or operated by:

Apple Inc., an electronic communications service and/or remote computing service

provider headquartered at One Apple Park Way, Cupertino, California, host of iCloud

Account alainrivas78@gmail.com (the Target Account).

**ATTACHMENT B**
ITEMS TO BE SEIZED

## I. Service of the Warrant

The officer executing the warrant shall permit Apple, as the custodian of the computer files described in Section II *infra*, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

## II. Items Subject to Seizure

To the extent that the account described in Attachment A is within the possession, custody, or control of Apple, Apple shall disclose the following electronically stored information for the iCloud account (also described *infra*), even if that information has been deleted but is still available to Apple, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f):

a.   All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.   All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers, Advertising Identifiers, Global Unique Identifiers, Media Access Control addresses, Integrated Circuit Card ID numbers, Electronic Serial Numbers, Mobile Electronic Identity Numbers, Mobile Equipment Identifiers, Mobile Identification Numbers, Subscriber Identity Modules, Mobile Subscriber Integrated Services Digital Network Numbers, International Mobile Subscriber Identities, and International Mobile Station Equipment Identities;

c.   The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information

including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

d.  The contents of all instant messages associated with the account, including stored or preserved copies of **Facebook**, **Instagram**, **Silent Circle**, **Threema**, **WhatsApp**, and/or **Signal messages**, other instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

e.  The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, including encrypted communications platforms such as **Facebook**, **Instagram**, **Silent Circle**, **Threema**, **WhatsApp**, and/or **Signal contact lists and logs**, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

f.  All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, **Facebook**, **Instagram**, **Silent Circle**, **Threema**, **WhatsApp**, and/or **Signal logs**, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

g.  All telephone and FaceTime call logs, SMS and iMessages, third-party application data, keybag and FileInfoList.txt files, and iCloud device backup data;

h.  All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps to include date and time stamps;

i.  All records pertaining to the types of service used;

j.  All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

k.  All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, *inter alia*, the keybag.txt and fileinfolist.txt files).

## III. Search

The search of the electronically stored information supplied by Apple pursuant to this warrant will be conducted by HSI as provided in the "Procedures for Electronically Stored Information" section of the affidavit submitted in support of this search warrant and will be limited to the period of May 29, 2025, up to and including July 19, 2025. Information subject to seizure under this warrant shall be limited to evidence:

a.  tending to identify attempts or completed acts of smuggling cocaine or some other federally controlled substances from Mexico into the United States;

b.  tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the smuggling of cocaine or some other federally controlled substances from Mexico into the United States;

c.  tending to identify co-conspirators, criminal associates, or others involved in smuggling cocaine or some other federally controlled substances from Mexico into the United States;

d.  tending to identify travel to or presence at locations involved in the smuggling of cocaine or some other federally controlled substances from the Mexico into the United States, such as stash houses, load houses, or delivery points;

e.  tending to identify the movement of proceeds made from smuggling cocaine or some other federally controlled substances from Mexico into the United States, as well as other financial transactions completed in support of these smuggling efforts;

f.  tending to identify the user of, or persons with control over or access to, the **Target Account**; and/or

g.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described *supra*;

which are evidence of violations of Title 21, United States Code, Sections 952, 960, and 963.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

## AFFIDAVIT

I, Kevin Day, being duly sworn, hereby state as follows:

## INTRODUCTION

1.      I make this affidavit in support of an application for a search warrant for information associated with the following iCloud accounts that are stored at premises owned, maintained, controlled, and/or operated by Apple Inc. ("Apple"), an electronic communications service and/or remote computing service provider whose primary computer information systems and other electronic communications and storage systems, records, and data are located at One Apple Park Way, Cupertino, California:

- ▪ iCloud Account alainrivas78@gmail.com, used by Alain Isai Rivas Contreras ("RIVAS") ("the **Target Account**");[1]

as further described in Attachment A, respectively, for items that constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, possession of controlled substances with intent to distribute and conspiracy to do the same, in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and importation of controlled substances[2] and conspiracy to do the same, in violation of Title 21, United States Code, Sections 952, 960, and 963, as described in Attachment B. This affidavit is made in support of an application for a search warrant under Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Apple to disclose to the United States copies of the information (including the content of

---

21
22
23
24
25
26
27
28

[1] As described further *infra*, on July 25, 2025, investigators obtained data from RIVAS' cellphone, pursuant to a federal search warrant for the cellphone, which was seized from RIVAS during his July 2025 arrest. The data reflects RIVAS' telephone number, +52-66-4135-9620, and Apple ID, alainrivas78@gmail.com (*i.e.*, the **Target Account**). According to the data on RIVAS' cellphone, the last iCloud back-up prior to RIVAS' arrest was on or about July 19, 2025, or the day of RIVAS' arrest at the Otay Mesa Port of Entry (POE). A preservation order was served upon Apple for the **Target Account**. Of note, though RIVAS' cellphone also indicated another potential iCloud account, or ianemilianor2504@gmail.com, Apple, while confirming receipt of the preservation order, underlined that it cannot locate any account(s) associated with that email address.
[2] Throughout this affidavit, I use "drugs," "narcotics," and "federally controlled substances" interchangeably.

1

communications) described in Section II of Attachment B. Upon receipt of the information, United States-authorized persons will review that information to locate the items described in Section III of Attachment B.

2.      The following is based on my own investigation and my consultations with other law enforcement personnel involved in this investigation. Since this affidavit is for a limited purpose, I have not included every fact I know about this investigation. I set forth only facts necessary to establish foundation for the requested warrant. Any conversations and/or discussions provided below are set forth in substance unless noted. If any of these conversations and/or discussions occurred in Spanish, I have provided the English translations of those conversations and/or discussions completed by a fluent Spanish-speaking member of the investigative team. My interpretations of certain statements are set forth in parentheses or brackets and are based upon my knowledge of the investigation. Dates and times are approximate.

## EXPERIENCE AND TRAINING

3.      I am an "investigative or law enforcement officer" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

4.      I have been employed as a Special Agent ("SA") with Homeland Security Investigations ("HSI") since February 2016. I am currently assigned to the HSI Office of the Assistant Special Agent in Charge in San Diego, California. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia.

5.      During my tenure with HSI, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California. Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers, particularly those who attempt to import narcotics into the

United States from Mexico at POEs.

6.     Through my training, experience, and conversations with other members of law enforcement, I have gained a working knowledge of the operational habits of transnational criminal organizations. I am aware that it is common practice for organized criminal organizations to work in concert with other individuals and to do so by utilizing cellular telephones. I know that drug traffickers often require the use of a telephone facility to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances and for arranging the disposition of proceeds from the sales of controlled substances. I know that professional drug operations depend upon maintaining their extensive contacts. The telephone enables drug traffickers to maintain contact with associates, suppliers, and customers. I also know that drug traffickers sometimes use fraudulent information, such as fictitious names and false addresses, to subscribe to communication facilities, especially cellular phones, and frequently change communication facilities to thwart law enforcement efforts to intercept their communications. They also often use coded language to obscure conversations about their unlawful activity because they believe coded language makes it more difficult to identify their conduct. Because they are mobile, the use of cellular telephones permits members of criminal networks to easily carry out various tasks related to their activities, including *e.g.*, remotely monitoring the progress of shipments while still in transit, providing instructions to couriers, warning accomplices about law enforcement activity, and communicating with co-conspirators who are transporting of illicit proceeds.

7.     Based upon my training and experience and consultations with law enforcement officers experienced in narcotics smuggling investigations, I am aware that the use of Apple services and associated devices (such as iPhones) by drug traffickers tends to generate evidence that is stored on the iCloud account, including, *inter alia*, chats, instant messages, photographs, contact lists, IP addresses, connected social network accounts, and location data.

//

## JURISDICTION

8.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by Title 18, United States Code, Section 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

### Background Concerning Apple[3]

9.      Apple is an American company that produces the iPhone and iPad, both of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

10.      Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As detailed *infra*, the services include email, instant messaging, and file storage:

a.      Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.      iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct audio and video calls.

---

[3] The information in this section is based on information published by Apple on its website, including *inter alia*, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at https://www.apple.com/legal/privacy/law-enforcement-guidelines-us.pdf; "Create and start using an Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/iCloud/; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; "iOS Security," available at https://www.apple.com/business/docs/iOS_Security_Guide.pdf, and "iCloud: How Can I Use iCloud?," available at https://support.apple.com/kb/PH26502.

4

c.      iCloud is a cloud storage and cloud computing service from Apple that allows its users to interact with Apple's servers to utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on iCloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on the user's Apple devices. iCloud Backup allows users to create a backup of their device data. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

d.      Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

e.      Find My allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of iOS devices, as well as share their location with other iOS users. It also allows owners of Apple devices to manage, interact with, and locate AirTags, or tracking devices sold by Apple.

f.      Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System networks, and Bluetooth, to determine a user's approximate location.

g.      App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either

Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

11.     Apple services are accessed via an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. The account identifier for an Apple ID is an email address, provided by the user. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

12.     Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

13.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes

Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "capability query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the "Find My" service, including connection logs and requests to remotely find, lock, or erase a device, are also maintained by Apple.

14.    Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number, which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address, the unique device identifier, and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service and the repair history for a device.

15.    Apple provides users with five gigabytes of free electronic space on iCloud; users can also purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service

("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps, including the instant messaging and voice communication services like **Facebook**, **Instagram**, **WhatsApp**, **Silent Circle**, **Threema,** and **Signal** may also be stored on iCloud. Some of this data is stored on Apple's servers in an encrypted form but may nonetheless be decrypted by Apple.

16.    In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described *supra*. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

17.    For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

18.    In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date, and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the

geographic and chronological context of access, use, and events relating to the crime under investigation.

19.    Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.*, information indicating a plan to commit a crime) or consciousness of guilt (*e.g.*, deleting account information to conceal evidence from law enforcement).

20.    As described *supra*, Apple iPhones come with pre-installed applications that are written, maintained, and updated by Apple, including, *inter alia*, Apple Maps, iMessage, Mail, Photos, and Camera. Based upon my training and experience with the Apple iPhone, these apps are often connected with Apple's iCloud back-up service. Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

21.    Based on my training and experience, I know a search of this electronically stored information in support of drug trafficking investigations tends to yield evidence:

        a.    tending to identify attempts or completed acts of smuggling federally controlled substances from Mexico into the United States;

        b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, third-party application accounts and identifying information, and phone numbers–used to facilitate the smuggling of federally controlled substances from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in smuggling federally controlled substances from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the smuggling federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the movement of proceeds made from smuggling cocaine or other federally controlled substances from Mexico into the United States, as well as other financial transactions completed in support of these smuggling efforts;

f. tending to identify the user of, or persons with control over or access to, the Target Account; and/or

g. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

22. Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## The Target Account

23. On or about July 19, 2025, at 9:34 a.m., RIVAS, a Mexican citizen, applied for entry into the United States from Mexico via the San Ysidro POE. RIVAS was the driver, sole occupant, and registered owner of a 2018 Kia Forte ("the sedan"), bearing Mexican license plates.

24. During pre-primary inspection, a Human and Narcotic Detection Dog alerted to the sedan's floor. Opening the car's rear-passenger-side door, the canine-handling Customs and Border Protection officer ("CBPO") then pulled the sedan's

10

carpet from its rocker panel, discovering the top of a large compartment, pink in color, within the sedan's floor.

25.    When asked what he was bringing into the United States by another responding CBPO, RIVAS, still in pre-primary inspection, stated that he was not bringing anything. Asked again, RIVAS said that he had nothing and that he was heading to Plaza Las Americas to go shopping. Asked where he was going, RIVAS said, once more, that he was planning to shop in San Ysidro. RIVAS then made two negative declarations. RIVAS was promptly arrested, while his sedan was sent to secondary inspection.

26.    Officers later found 40 packages—weighing approximately 48.62 kilograms or over 107 pounds—of cocaine from the driver-side floor, passenger-side floor, and passenger-side glove box. A sample of the substance field-tested positive for cocaine. Part of the floor compartment is pictured *infra*:



***Figures 1 and 2: The Sedan's Floor Non-Factory Compartment with 33 Cocaine Packages***

***Figure 3: The Sedan's Glovebox with 7 Cocaine Packages***

27.    RIVAS was subsequently charged with importing cocaine, in violation of Title 21, United States Code, Sections 952 and 960.

28.    About three hours following his arrest, RIVAS sat down with the undersigned and a translator. After providing biographical information and receiving his *Miranda* advisal, RIVAS spontaneously uttered: "My family is in danger. I can't talk. I need an attorney." Concerned for RIVAS' family and stating his setting aside of RIVAS' case, I asked RIVAS if there was anyone I could contact to warn his family of their danger, such as RIVAS' wife. After a back-and-forth, RIVAS stated that there was no need to contact the police in RIVAS' hometown of Durango, Mexico.[4] Later, RIVAS added: "it's just that I'm scared", "I'm obligated here in Tijuana", and "they've sent me photos of them", seemingly referring to his family.

_____

[4] RIVAS was previously a middle-school teacher in Durango, an approximately 22-hour drive from the San Ysidro POE. Defendant apparently moved from Durango to Tijuana approximately a month prior to his arrest.

29.    In the preceding 42 days, RIVAS crossed into the United States from Mexico four prior times in his same sedan.[5] Seized from the sedan, RIVAS' vehicle registration card was issued by the Baja California government on May 29, 2025, or nine days prior to his first international crossing.[6] Each of the sedan's four crossings occurred at approximately 9:00 a.m., including the instant crossing, before returning outbound approximately three to four hours later at approximately 1:00 p.m., excluding the most-recent outbound crossing when the vehicle spent 121 minutes in the U.S. Additional investigation, including review of POE primary surveillance footage, revealed that during RIVAS' prior crossings on June 22, 2025 and June 29, 2025, RIVAS similarly told the primary officer that he was entering the U.S. to go shopping.

30.    Returning to his instant arrest, RIVAS' cellphone was found by a CBPO on RIVAS' person within the front pocket of his pants. A laptop was also found in the sedan's backseat.

31.    On July 21, 2025, United States Magistrate Judge David D. Leshner of the Southern District of California signed a search warrant authorizing the search of the cellphone, a white Apple iPhone, seized from RIVAS.

32.    On August 11, 2025, I reviewed the results of the cellphone's forensic examination. I discovered RIVAS' phone number, or +52-66-4135-9620. The extraction also revealed that Apple IDs alainrivas78@gmail.com (*i.e.*, the **Target Account**) and ianemilianor2504@gmail.com are associated with Apple iCloud accounts. Of note, while confirming receipt of the preservation order for the **Target Account**, Apple noted that it cannot locate any account(s) associated with the email address ianemilianor2504@gmail.com. Thus, the instant application solely seeks pertinent data from Apple ID alainrivas78@gmail.com, or the **Target Account**. The

---

[5] Before then, since August 31, 2024, RIVAS' crossing history includes four pedestrian crossings and one bus crossing.

[6] The outside of RIVAS' vehicle registration card was similarly stamped on May 29, 2025 as "received" (translated) on behalf of the Secretary of the Treasury of Tijuana, Baja California.

most recent iCloud backup was at 7:34 a.m. on the exact day of RIVAS' arrest, or July 19, 2025 (*i.e.*, approximately two hours prior to RIVAS' arrest at the Otay Mesa POE).

33.    Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that additional location data, subscriber accounts, email addresses, phone numbers, and other digital information related to the Apple ID are stored in Apple's iCloud. In light of the above facts and my experience and training, there is probable cause to believe that the **Target Account** was logged in to RIVAS' cellphone and being utilized to assist and further the importation of illicit narcotics into the United States.[7] Further, in my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug smuggling event in the days and weeks prior to an event and often delete digital information related to smuggling ventures. Additionally, based upon my experience and training, Apple users can adjust their phone settings to automatically back up data to the iCloud. Accordingly, I request permission to search the iCloud **Target Account** for a 51-day window, including data beginning on May 29, 2025 (*i.e.*, the date that RIVAS registered his sedan with the Baja California government and nine days prior to his first international crossing), up to and including July 19, 2025 (*i.e.*, the date of RIVAS' arrest).

34.    As noted above, I am aware that it is common practice for organized criminal organizations to work in concert utilizing cellular telephones and communication applications. A common tactic utilized by narcotics traffickers is to smuggle controlled substances into the United States from Mexico by concealing the controlled substances in vehicles or on persons entering the United States at POEs. With

---

[7] On the other hand, given RIVAS' pre-*Miranda* utterance to the undersigned that "[t]hey've sent me photos of them," seemingly referring to drug traffickers sharing photos of RIVAS' family and alluding to his offending under potential duress, iCloud data on RIVAS' cellphone could, in fact, verify RIVAS' account.

respect to the importation of narcotics in this manner, I am aware that narcotics traffickers in Mexico frequently communicate with the individual responsible for importing the concealed narcotics into the United States. These communications can occur before, during, and after the narcotics are imported into the United States. For example, prior to the importation, narcotics traffickers frequently communicate with the transporters regarding arrangements and preparation for the narcotics importation. When the importation is underway, narcotics traffickers frequently communicate with the transporters to remotely monitor the progress of the narcotics, provide instructions, and warn accomplices about law enforcement activity. When the narcotics have been imported into the United States, narcotics traffickers may communicate with the transporters to provide further instructions regarding the delivery of the narcotics to a destination within the United States.

35.    Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking, and all the facts and opinions set forth in this affidavit, I am aware that communication applications, such as iCloud, can and often do contain electronic evidence, including data, such as messages, chats, and chat logs from various third-party applications, photographs, audio files, videos, and location data.

36.    Based upon my knowledge of the investigation and my training and experience, I believe that the **Target Account** will reveal efforts to coordinate and facilitate the importation and subsequent distribution of controlled substances within the United States. Unless disabled by a sophisticated user, iCloud accounts are automatically created and backed up. If the user of the account is using an Apple device such as an iPhone, device information will be automatically backed up to their iCloud account, as RIVAS' cellphone seemingly did approximately two hours prior to his arrest.

37.    Based upon my experience investigating narcotics traffickers, I believe that RIVAS was working with co-conspirators while trafficking narcotics into the

United States and that he was likely utilizing his cellphone, tied to the **Target Account**, to do so. I believe that information contained in the **Target Account** including: subscriber and/or user information, all electronic mail, files, cloud storage, location information, search history, images, text messages, voicemail, histories, buddy or friend lists, contacts, iCloud Drives, iCloud files, iCloud Backup and Restore, photos, notes, videos, calendars, messages profiles, methods of payment, detailed billing records, access logs, and transactional data will contain evidence of drug importation and distribution and may lead to the identification of co-conspirators. I further believe that evidence of drug trafficking (such as iMessages, text messages, WhatsApp messages, and Facebook Messenger communications, photos, videos, locations, and contacts) may be stored in the **Target Account**. From my training and experience, I also know that narcotics traffickers are often in communication with co-conspirators well before they transport their first load of narcotics and often have transported multiple loads of narcotics before apprehension. Again, I request data for the **Target Account** beginning on May 29, 2025, up to and including July 19, 2025.

38.    Additionally, it is believed that the records are still available to Apple as a request to preserve was made under 18 U.S.C. § 2703(f).

### PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

39.    The United States previously attempted to obtain this data by examining the Attachment B review of RIVAS' cellphone following an initial 14-day search warrant, signed by Judge Leshner on July 21, 2025.

### PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

40.    Unlike Apple personnel, federal agents and their investigative support are trained and experienced in identifying communications relevant to the crimes under investigation. It would be inappropriate and impractical for federal agents to search the vast computer network of Apple for the relevant accounts and then to analyze the contents of those accounts on Apple premises. The impact on Apple business would be disruptive and severe.

41.    Therefore, I request authority to seize all content as described in Attachment B. To minimize interference with the business activities of Apple and protect the privacy of ISP subscribers whose accounts are not authorized to be searched, HSI seeks authorization to allow Apple to make a digital copy of the entire contents of the accounts subject to seizure, as described in Section II of Attachment B. That copy will be provided to me or any authorized federal agent. The copy will be imaged, which will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Section III of Attachment B. Relevant electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

42.    Analyzing the data to be provided by Apple may require special technical skills, equipment, and software and may be time consuming. Searching by keywords, for example, often yields thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by ISPs increases, the time it takes to properly analyze recovered data increases dramatically. Apple does not always organize the electronic files they provide chronologically, which makes review more time consuming and may also require the examiner to review each page or record for responsive material.

43.    Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data-analysis techniques and take weeks. Keywords need to be modified continuously based upon the

results obtained and, depending on the organization, format, and language of the records provided by Apple, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination will complete the analysis within **ninety (90) days** of receipt of the data from the ISP, absent further application to this Court.

44.     Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic mails that identify any users of the subject account and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

45.     All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## CONCLUSION

46.     Based on all of the facts and circumstances described *supra*, there is probable cause to conclude that RIVAS used or still uses the **Target Account** to import federally controlled substances and/or conspired to commit the same, in violation of Title 21, United States Code, Sections 952, 960, and 963.

47.     There is probable cause to believe that evidence of illegal activities committed by RIVAS and others continues to exist on the **Target Account**. As described *supra*, I believe that this search should extend to all evidence described in Attachment B in existence for the **Target Account** from May 29, 2025, up to and including July 19, 2025.

//
//
//
//
//

48.     WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the account described in Attachment A and seize the items listed in Attachment B, using the methodology described above.

I swear that the foregoing is true and correct to the best of my knowledge and belief.

_____*Kevin Day*_____
Kevin Day
Homeland Security Investigations, Special Agent

Attested to by the applicant, in accordance with Fed. R. Crim. P. 4.1, by telephone on September 25, 2025.

_____
Honorable Michelle M. Pettit
United States Magistrate Judge

19